Yeah, we understand that, Your Honor. Thank you. I'm Charles Rothfeld, representing the appellant, Cross Appellee Siemens. And if I may, I'd like to reserve five minutes of time for rebuttal. Yeah, sure. Thank you, Your Honor. This case involves a claim for... You'll have to talk slowly and clearly so we can hear you. And, by the way, we do listen to the disc. This all goes on a disc, and we listen. I mean, as soon as it's over, my law clerks call up and get the discs. So speak clearly. Okay. I appreciate that warning. Thank you, Your Honor. This case involves a claim for permanent job separation benefits, PJS benefits, a kind of enhanced severance payment that plaintiffs assert against Siemens under ERISA. It involves two principal questions. The first is whether ERISA provides a cause of action at all to these plaintiffs, and we say that it does not. The second is, even if that is not so, and they may proceed under ERISA, whether or not a substantial majority of the plaintiffs, 200 or so out of about 220, waive their claims by executing express and unambiguous waivers. And we say that they do. The district court said that was an issue of fact that had to be decided, right? The waiver, the effect of the releases. That's correct. And I'll talk about these two issues in turn, but just to answer your question directly now. I want to get this in context. If you win on the first issue, then the employees who did not sign necessarily will lose. That is correct. If we win on the first issue, the case is over. Well, is that actually technically before us? In other words, is the question, is it like an appeal by Siemens against the non-releasing employees that are before us? I understand what the consequence of the result would be, but I'm just wondering if technically that issue is before us. That is correct. That issue is technically not before the court. What is before the court is the appeal on the ERISA question, this merits question, by the plaintiffs who did not sign releases. And so as to them, there is a final judgment that's been answered. But you said there was a cross appeal. What's the cross appeal? The cross appeal relates to the release question. But if the court resolves the direct appeal in our favor and holds that there is no ERISA claim at all, the claims of the release and the non-release plaintiffs are identical. And so it necessarily will follow that if we prevail on the ERISA question as to the non-release plaintiffs, the case will have to end. Well, all we could do if you prevail on that is send it back to the district court and tell them to consider the question of the non-release plaintiffs taking into account our decision. That is fairly obvious what it would have to do. I think that both parts of that statement are correct. It would have to go back down in the first instance, but if the court were to resolve it in our favor on the ERISA question, there could be only one outcome. And so I think effectively this case is going to, this appeal will decide whether or not the case can proceed for all these plaintiffs. As I say, there are the two issues. I'll start on the first, on the merits question. Which question? On the question whether there is an ERISA claim at all. And as to that, we think the answer is clear. It's resolved by a fundamental ERISA principle, which is that claims for ERISA benefits must be stated, must be derived from the document, the ERISA plan documents themselves. The Supreme Court has said that. It said it recently in the Kennedy case in which it said expressly that a claim for ERISA benefits stands and falls on the terms of the plan documents. In this case, and I should say that's a very important principle because it's really a fundamental importance that employers be able to tell what their responsibilities are by looking to the terms of the documents that they wrote. As the Supreme Court has said, if that were not the case, employers would be discouraged from creating ERISA plans in the first place for fear that they would be on the hook down the road for unanticipated liability. In this case, the plaintiff's previous employer, Westinghouse, did provide PJS benefits in its pension plan, but Siemens did not. Siemens has never in any pension plan, not at the time, not now, has never provided PJS benefits. Excuse me. Isn't there actual language in which Siemens undertook to adopt the Westinghouse plan? I mean, this is a, right? I think that that is not correct, Your Honor. And let me say two things about that. First of all, it is clear from the terms of the Siemens plan, it is sort of undisputable that if one looks at the Siemens plan document. But I'm talking about the APA. Yeah, I understand, Your Honor, but, and I will get to that if I may in just one second. Our position is the APA cannot create rights here because it is not a plan document. It's an agreement. But the APA, did it not provide that Siemens would adopt a plan for the Westinghouse employees that would be substantially similar to the plan that Westinghouse had in place? That would be substantially similar to the plan that Westinghouse had in effect, the terms of which would be substantially similar to the plan that Westinghouse had in effect on the date of closing of this transaction. On the date of closing, this Westinghouse plan did not provide for PJS benefits. There was a provision in the Westinghouse plan that provided that as of September 1st, 1998, the closing date, PJS benefits were not available. I thought the closing date was August 18th. They consummated the transaction on August 18th. They signed the APA. But the APA said expressly the closing date is deemed to be September 1st, 1998. And as of that date, as I said, there were no PJS benefits that were provided by the Siemens plan. Those benefits had sunsetted. But they had sunsetted illegally, is that it? Well, at the time that this plan, that the APA was executed, it was thought that the PJS benefits were perfectly proper as they were stated in the Westinghouse plan. Now Westinghouse had PJS benefits in its plan. Who do you represent? Let's get that clear first. Sorry, Your Honor? Whom do you represent? Represent Siemens. Okay, go ahead, yeah. Westinghouse is not before this Court. This concerns, this case concerns only the Siemens liability. And that is a crucial point. Because as this Court held in the Bellis case, Westinghouse could not cut back on these PJS benefits. And so when they sunsetted on September 1st, 1998, the Court subsequently, years later, this Court found that that was an improper cutback to the Westinghouse plan. But Siemens has never provided PJS benefits in its plan. And so Siemens could not have cut back by eliminating PJS benefits. It never provided them in the first place. In the 11th Circuit, in the McKay case that we discuss in our briefs, a case identical to this one, involving exactly the same transaction, exactly the same plans, the 11th Circuit said expressly, Siemens has never provided PJS benefits. We're not bound by that. That's not our precedent. Certainly not, Your Honor. But it's certain, it is. That's in the federal appendix, isn't it? That's true. I guess I would suggest that's because it was pretty clear what the outcome should be. Certainly it's not binding on this Court. But it is suggestive that a panel of the 11th Circuit looked at exactly this transaction and concluded correctly, in our view, that Siemens was not liable because, indisputably, it has never provided PJS benefits in its plan. I don't understand what you're saying. Paragraph 5.5, I think, section, paragraph, says that Siemens would offer its, the legacy employees, a pension plan containing terms and conditions that are substantially identical with those of the Westinghouse pension plan in effect at the time. Now, that's an explicit undertaking in the contract, right? And you're saying it doesn't mean anything. No, I'm not saying that, Your Honor. I'm saying two things. What does it mean, then? I'm saying two things. I'm saying, first, it is not a plan document. So that in itself is dispositive. But even leaving that aside, what it means is that Siemens will put in effect a plan, Siemens undertook to put in effect a plan that had terms identical to the, substantially identical to the Westinghouse plan. Okay, and that plan offered PJS, right? It did, that, only until, however, only to employees who were terminated prior to September 1st, 1998. This deal closed on September 1st, 1998, and so Your concept was that they continued to be covered by the Westinghouse plan until they were terminated. That is not correct, Your Honor. They were covered by the Westinghouse plan until this deal closed on September 1st. That's what I mean, until they were terminated before September 1st. That's correct. After that, they were covered by Siemens. By Siemens, and the Siemens plan, which in this respect was identical to the Westinghouse plan, did not provide PJS benefits to employees terminated. But Siemens offered employment to any of the Westinghouse employees? It did. The Westinghouse employees transferred to become Siemens employees. That's right. At which point, they were covered by the Siemens plan, which did not provide PJS benefits, because again But they undertook to provide the same thing that the Westinghouse, the Westinghouse plan provided. And again Like I just said, a pension plan containing terms and conditions that are substantially identical with those of the Westinghouse pension plan in effect at the time. And again, Your Honor, the Westinghouse plan in effect at the time, as of September 1st, 1998, did not provide PJS benefits. What did they think they were signing when they signed this? What did The Siemens people, yeah. What did they think they were signing? They thought that they were agreeing to adopt a plan that was identical to the Westinghouse plan, which terminated the benefit. The Westinghouse plan had PJS benefits, so they were adopting a plan that was identical. But if I may, Your Honor, it is fundamental to ERISA that conditions for obtaining benefits must be satisfied by the employees. A condition under the Westinghouse plan to obtain a PJS benefit, there are a number of conditions. One of them was you must be terminated before September 1st, 1998. So the plan that Siemens said it was going to adopt substantially identical terms to said if you are terminated after September 1st, 1998, you do not get PJS benefits. Whose plan said that? The Siemens, the Westinghouse plan said that. It said that in actual words and language? Oh, yeah, absolutely, Your Honor. But by operation of law, that was invalid. It was held years after the fact to be invalid. Well, it was held invalid, yeah. But when Siemens said that it was adopted, we're looking at what the intent of Siemens was at the time. Siemens looked at this document, which said there are no PJS benefits available after September 1st. It had been warranted by Westinghouse to be in compliance with the law of the department, the Internal Revenue Service. Maybe you have a breach of warranty claim, but you – Well, but again, Your Honor, we're looking at – the APA is a contract. It's not a planned document. So we have to look at what Siemens intended to do as a contractual matter, assuming that this is enforceable at all. And again, our position fundamentally is that it's not. But if one looks at the APA as a contract, the question is, what does Siemens intend to commit? It could not reasonably be thought that Siemens intended to commit itself to act as an insurer against all of the unapparent, hidden defects that might years after the fact – I know that's in your brief. That language is in your brief. But that's really not what's before us. What's before us is actual language in the APA. But again – but the question is, what does – I mean, it's specific – it specifically says that. Well, again, Your Honor, it says the terms of the plan. The terms of the plan as they were written, as they appeared, and as they were read by Siemens said that the sun sets as of September 1st, 1998. And so reasonably, that was what – truly, when Siemens looked at the language of the APA, they were going to give you what the terms of the plan say. The terms of the plan, the literal language of the APA are the terms of the plan, in effect, as of September 1st. And – What about our decision in Bellis? Well, again, Your Honor, I think Bellis is an – I would submit is a helpful decision for us. Really? Bellis says that Westinghouse could not cut back on PJS benefits that it had provided. The Westinghouse plan provided PJS benefits, as Judge Greenberg's opinion for the Court said in Bellis. To change that after the fact, after those plan – after those benefits had been promised and had accrued, to cut them back was a cutback. That violates ERISA because Westinghouse had promised to provide these benefits and did provide them. Siemens never promised in a plan document or anywhere else – With Westinghouse. But you're saying it had a contract to adopt a dead horse. It had a contract to adopt – again, as a contractual matter, looking at what Siemens would have had in mind. And again, this is stipulating that the APA is an enforceable document, and we say clearly it is not on the Supreme Court's decision in Kennedy. But – What did you just say? The APA does not create enforceable ERISA benefits because it is not a plan document. And again, I'll point to the Court – But it's a contract. It's a – and Westinghouse – it provides enforceable rights to Westinghouse and to Siemens. But it is a contract – again, if we're looking at the contract, it disclaims – it expressly disclaims creation of third-party benefits. And so even as a contractual matter, and even if we ignore the fact that it's not a plan document, it could not create rights on the part of these plaintiffs because it says expressly – and again, Your Honor – Well, if prior to the closing date, the Westinghouse plan had provided that the cutoff date for PJS benefits would be September 1 or August 31, 2000, after the closing date, you would have been – you would have had to have a plan that provided for PJS benefits. To comply with the APA, that is correct. But it didn't say that. And in fact – and I see my time is long expired, Your Honor, but just to follow up very briefly on that question, the APA was written long before this took place. It was written in November of 1997. And at that time, it was expected that PJS benefits, in fact, would be available for some period while these employees were working for Siemens. And so it was expected that if the employees had been terminated during that period, that was September 1, 1997, September 1, 1998, PJS benefits could be available. But the consummation of the transaction was delayed very substantially until the middle of August 1998. At that point, the APA was amended, and there is an express amendment to the APA, which governs here, which says that Westinghouse will be responsible for all ERISA liabilities during this window period, before the employees sign on to the Siemens plan. You reserved a lot of rebuttal time. I did, Your Honor. Why don't we hear from Mr. Rhodes, if that's all right. Thank you, Your Honor. And then we'll hear from you in rebuttal. Is that all right with you? Sure. You okay? Yeah. There's one here. You got it? Got it? Okay. May it please the Court, I'm David Bennett Rhodes, and I'm here for the plaintiff retirees. It appears that the principal question on what's been called the merits that applies to everybody here, as to whether there is a cause of action at all against Siemens, is whether Siemens was writing on a blank slate when it created its plans that did not provide for a PJS pension. We believe it's clear that it was not writing on a blank slate, because the law assigns obligations in connection with its voluntary assumption of responsibility for the particular liabilities at issue here. And the Court has noted that there was an undertaking to provide substantially identical pension benefits. In addition to that... He says it doesn't exist. They didn't really... It's there, but it doesn't mean anything. Well, Your Honor, and he's trying to make an expansive view of the planned document rule, and say that the asset purchase agreement was not a planned document. In this regard, I'd like to call the Court's attention to a recently decided decision that came out after all of the briefing was done. The Fifth Circuit in Evans v. Sterling... Did you send us a letter? I have not sent a letter, Your Honor. Oh, usually people send us letters with the latest cases. I learned of this when I was preparing for argument, and I thought I was too close to the argument date to send a letter. Okay, so what's the name of this case? Evans v. Sterling Chemicals, Inc. It's 660... Hold it, hold it. Sterling? S-E-R-L? Sterling. Oh, Sterling. 660 Fed Third 862. What court? It's the Fifth Circuit Court of Appeals, and it's October 13th of 2011. Oh, it just came out last week. Yes. And, Your Honor, in that case, the Court interpreted and expanded on an earlier case from the same circuit in holding that an obligation undertaken in an asset purchase agreement could constitute an amendment to a benefit plan. I don't really want to make further argument about what the case says, but I just want to call it to the Court's attention for its review in case it thinks... So that we can make something out of it. Well, in case the Court thinks the issue is significant. I don't believe that the Court needs actually to go into the question at all because Section 208 of ERISA has been interpreted by the Treasury Department in regulations, and its exact text also, I believe, compels a result that benefits that are protected under Section 204G, which the benefit at issue was held so by this Court in Bellis, those benefits cannot be avoided through a transfer of assets or liabilities. And 208, by its own terms, applies whenever there is a transfer of liabilities. And Siemens has argued that there was no transfer of liabilities, but in the asset purchase agreement, there is express language transferring the liability for the very thing at question. This is quoted at the bottom of page two and top of page three of our initial brief. It says that the purchaser pension plan shall be solely responsible for, and the Westinghouse plan shall not provide for, benefits pursuant to Section 19. Section 19 is the section that has the PJS benefit. And what's telling in here is it says, with respect to an employee who retires or terminates with the purchaser after the closing date. Now, they're saying that Siemens is claiming that the thing sunsetted and they had no liability after the closing date. Sort of like overnight, basically, isn't that? Well, they tried hard to set the date of their responsibility after the sunset, but they actually had a provision in the agreement that was closing that talked about who would be responsible for the benefit after the closing date, for people who retired after the closing date or were laid off after the closing date. Your Honor, we believe that the district court... What provision was that? Sorry, this is Section 5.5D4 of the asset purchase agreement. It says that the purchaser plan will be responsible for the PJS benefit with respect to people who are laid off after the closing date by the purchaser. That's exactly the situation we have here. They say that they had no anticipation that there would be such people that they weren't, that they weren't, as Judge Slobider aptly observed, did they mean that this provision would have no meaning at all. We think that the provision is required by law to have meaning. That the district court was quite correct in saying that this clearly constituted a transfer of liabilities from one plan to the other. The Westinghouse plan was subsequently amended with regard to the bargaining unit employees transferred to take out the responsibility for this same benefit because it had been transferred to the purchaser plan. The fact that they adopted written plan documents later shouldn't change the result. They undertook to provide this exact benefit and they can't avoid it being a transfer by shenanigans with the papers later on. I'd like to turn, if I may, to the question of the releases. Yeah, I was going to ask you about that. Your Honor, these are... Why are the releases an issue of fact? I mean, can't we decide that? I mean, they released it. Your Honor, I think both parties think that they're not an issue of fact. We believe that there's no issue of fact. Well, the court says that there's an issue of fact, that it is the burden of the defendant, of Siemens, to prove that these releases were subjectively intended by the people who signed them to apply to this benefit. Now, that's a burden they will not be able to meet in any person's case because it simply is not the case, and it will be a futile, repeated hearing to see whether they can put on any evidence of any person actually intending that. But, in fact, systematically, Siemens personnel... Let me just say this. It's pretty broad, though, those releases. Yeah. They are broad releases, Your Honor, and generic broad releases cannot be, as a matter of law, interpreted to cover pension benefits protected under Section 204G unless there's some further protection. And exactly where the line of that protection has to be drawn is a very difficult question. I know in the Seventh Circuit, in the Lynn case, attempted to draw it at if they're contested claims. And there has to be some ability for practitioners to settle contested ERISA claims for some compromise. But here, those things were not in contest. Nobody thought they were in contest. Nobody thought the releases actually applied to pension claims. And I think particularly significant is there's a technical advice memorandum that the IRS provided that says that if the waiver is at the behest of an employer, that would be an impermissible assignment or alienation of an employee's benefits because it would be an arrangement providing for payment to the employer of planned benefits that would otherwise be due to the employee. So Siemens is arguing that the Kennedy rule that you follow the plan, I'm sorry, Siemens is arguing that Kennedy, which observed that the rule against alienation of benefits doesn't always prevent a waiver, is dispositive. But in fact, in that case, it was not a waiver in Kennedy at the behest of the employer. It was a waiver in a marital situation. And a waiver at the behest of an employer has been held by the IRS to be something that's impermissible. Again, there has to be room somewhere to compromise a contested claim. But I believe that the result of this is that there has to be a lot more than what Siemens can show in this case before you have a triable question as to somebody voluntarily waiving this benefit. Do you agree with your adversary that if he's right on the first point, none of this matters? Yes, Your Honor. If we lose the first point, we're effectively out of court on everything. And do you represent the non-releasing plaintiffs? Yes, we represent all of the plaintiffs, Your Honor. There's a further issue with regard to the 20 plaintiffs who have a final judgment. We cross-appealed in that case with regard to the set-off of the severance. Now, the district court did two things about the severance. They held that there's a triable issue on whether there was effectively a waiver by signing the boilerplate broad releases, a waiver of the entire PJS pension. Separately from that, in the 20 cases where there was no release signed for the severance, what the court did was allowed a set-off of that severance benefit against the PJS benefit. We submit that this is just clear error because the same plan benefit rule applies here, the plan document rule, because the plan does not provide for coordination of benefits. Now, many plans do so that if you're getting a similar benefit from another source, that will be taken into account and reduced from your benefit under the plan. This plan made no provision for set-off for any other benefit. And as a matter of law, the court can't allow a set-off where the plan doesn't. The Kennedy case and the other cases cited in our brief are clear that the amount of the benefit has to be determined by looking at the plan, not by benefits from other sources. What authority did you file a cross-appeal because this was originally an appeal from a certified question? Well, Your Honor, if I may explain, there are two cases consolidated here. We have a final judgment for 20 people. It's a final judgment, and they filed an appeal from the final judgment, and we filed a cross-appeal on the final judgment from the set-off of the severance and from the disallowance of retiree health benefits with regard to that final judgment. There was also a certified appeal in which certain issues were listed, and those can waive the benefit and whether, if so, the court correctly stated the burden of proof. There hasn't been any contention of error on the court's assignment of the burden of proof to Siemens, and we think that that's conclusive of the matter. It's significant to us, Your Honor, that, in fact, this is a final judgment appeal, and we did cross-appeal on the set-off of severance benefits, and Siemens simply failed to address the issue. They said, this is premature. We should address it on remand, but we have a final judgment, and it should be addressed now, and we've got authorities. All right. A more important issue. I mean, it seems to me that's a minor issue, the severance thing. I think more important is the primary issue here as to whether Siemens is responsible for the SJP benefits. Now, what's the effect of the clause in the APA providing that it does not create rights for third parties? Well, Your Honor, I note that there's a similar clause in the Evans case that we cited in the Fifth Circuit, and they found that not to be a difficulty. In a short answer, it's not a matter of whether it creates rights on third parties because we're not suing under the asset purchase agreement. We're suing under Section 208 of ERISA, which we have a right to do because 208 imposes terms on the plan, and those terms can be borrowed from a voluntary undertaking in something to which we are not parties. It's the undertaking to provide the benefit and the, therefore, transfer of the liability. That's what creates obligations under Section 208 of ERISA. That's what I was going to ask you. Do you claim that the APA creates the rights you seek to enforce or that ERISA and the various plans create the rights? I would say ERISA creates the rights that we seek to enforce, but it imposes an obligation that was caused by the voluntary undertaking in the APA. Under the lead authority, such as Donovan versus Dillingham cited in our brief, specific formality is not required to make an enforceable obligation to provide plan benefits. All that is needed is something that shows that there's an undertaking and something that gives an objective standard to measure what the undertaking is, and those are both made out by the APA very clearly. We don't have to be a contract party enforcing it in contract because we are a participant or beneficiary enforcing ERISA. In the Evans case, as I understand it, the court found that the parties that had authorized the APA also had the authority to amend the plan document. That's quite correct, Your Honor. Does the record here show that whoever approved this APA had the authority to amend the plan document? Your Honor, I believe the record shows that the APA was approved by the board of directors. Well, the plan didn't exist at the time, Your Honor, as a formal plan document. The entity was the sponsor, and it can only act through its board of directors. I see that my time is up. No, that's all right. If we have questions, you can answer them. Do you have any questions?  Okay. All right. Thank you. Thank you, Your Honor. You know, many provisions of the APA and its amendments appear to assume that termination by Siemens would trigger a claim for PJS benefits. Isn't that right?  So if, as you contend, the plaintiffs are not eligible for PJS benefits under the terms of the Westinghouse plan because plaintiffs were not terminated by Westinghouse, why do you have all those provisions? That is a consequence of the timing of the deal and the way in which when the APA was written and when the deal ultimately was consummated. As I said on my opening, the APA was signed in November of 1997, and it was expected that it would be consummated very quickly. PJS benefits were not going to terminate. So you mean if the plan had been, if that had happened, then Siemens would be responsible for the PJS benefits, but they're not because of the delay? No. Well, they would be responsible for PJS benefits that were triggered before September 1st, 1998. It was thought that these employees would go to work for Siemens and be covered by a Siemens plan in, let's say, December of 1997. And would that Siemens plan have included the PJS benefits? It would have included PJS benefits. That would sunset as of September 1st, 1998. As to Siemens, that would have been a legitimate, legal, non-cutback arrangement because Siemens had never provided PJS benefits in its plan. What you're saying is that Siemens had it as an employee at a time when Westinghouse had the plan that was covering them. I'm saying it's confusing, so let me be clear. It was thought that this deal would be entered into in November of 1997. At that time, the PJS benefits would be available because they did not sunset until September of 1998. It was thought these employees would work for Siemens, covered by a Siemens plan that would provide PJS benefits that sunsetted on September 1st, 1998. That did not happen because the deal was not consummated until just before September 1st, 1998. But when it was consummated, the employees became Siemen employees, but the plan that covered them was still a Westinghouse plan. For a 13-day period until September 1st, 1998. And at that point, it sunsetted. Well, that was the Westinghouse plan. At that point, Westinghouse attempted to sunset their benefits. Siemens' plan went into effect on September 1st, 1998. It did not include a PJS provision. It never included a PJS provision. And so, again, just to be clear, to answer Judge Slaughter's question, the reason that there is language in the APA suggesting that Siemens would be liable for PJS benefits was because it was thought that if these employees worked for Siemens, let's say in December of 1997, were terminated, they would then have been covered by a Siemens PJS provision because they would have been terminated prior to September 1st, 1998. And what was the Siemens PJS provision? Well, Siemens never adopted such a provision because the Siemens plan didn't go into effect until September 1st, 1998. And that, I think, confirms our point. It was thought that the Siemens plan would adopt a provision identical to the Westinghouse provision, which had a September 1st, 1998 sunset. Because the deal wasn't concluded until August of 1998, Siemens never included such a PJS provision in its plan. Instead, these employees remained on the Westinghouse plan, covered by Westinghouse, subject to the Westinghouse PJS provision. And the Westinghouse provision sunsetted. It sunsetted. That's correct. I'm sorry? The district court held the plans for continuation of earlier plans that included the PJS benefit because the Siemens plan constituted a spin-off from the Westinghouse plan under ERISA section 208. Isn't that right? The district court did say that. And you think the district court was wrong? We think the district court was absolutely wrong. Well, the adverb doesn't make a difference. I'm sorry, Your Honor? It doesn't matter whether it was absolutely or not. I will be satisfied with the conclusion that it was incorrect. But we addressed this at great length in our brief. It is wrong for a variety of reasons. The initial reason was that it is premised on the assumption that there was a transfer of plan liabilities from Westinghouse to Siemens. That simply did not take place. It could not have taken place. Had there been such a transfer, the plans would have been illegal from the inception because, as this court said in Gillis, you can't transfer liabilities without transferring assets. It's conceded that there was no transfer of assets. It's also, I think, undisputed that neither Siemens nor Westinghouse intended there to be any such transfer. So there could not have been a spin-off created, and therefore the entire theory of continuation has to fall. I see my time has long expired, Your Honor. If there are further questions? No other questions. Thank you. Thank you very much, Your Honor. Thank you. We'll take this matter under advisement.